ATLAS PRODUCTS CORPORATION ET AL., Plaintiffs, Appellees, and Appellants, *v.* GERARDO ARROYO TORO, Defendant, Appellant, and Appellee.

No. 12667. Decided March 30, 1962.

*Orlando J. Antonsanti* for defendant, appellant, appellee. *F. Fernández Cuyar* for plaintiffs, appellees, appellants.

Division composed of Mr. Chief Justice Negrón Fernández, Mr. Justice Blanco Lugo, and Mr. Justice Dávila.

PER CURIAM.

Gerardo Arroyo Toro and Atlas Products Corporation entered into a contract whereby the latter would administer

---

a tannery owned by the former, located in Mayagüez. Disagreements arose between the parties. Robert Steinberg,[1] as assignee of Atlas, sued on the ground that Arroyo had violated the contract and claimed the profits which he failed to receive as a result of Arroyo's breach of contract. Arroyo on his part filed a counterclaim against plaintiffs alleging that Atlas was the party at fault and that it had caused him losses. The trial court sustained the complaint and dismissed the counterclaim, ordering the defendant to pay $44,596.80 plus costs and $10,000 for attorney's fees, on the ground that the defendant had been obstinate in litigating and denying the breach of contract. Both parties appealed to this Court, but Arroyo did not challenge that part of the judgment which dismissed the counterclaim.

In order to duly analyze the obligations under the contract and weigh the actions of the contracting parties, it is well to make a detailed statement of the facts.

Some time in 1942, Gerardo Arroyo Toro had purchased a certain property and as part of the business he acquired a tannery established therein. At the beginning the tannery was designed and equipped only for the manufacture of *vegetable* leather.[2] In 1945, Arroyo engaged the services of an expert, Lee Soesbe, to reorganize the plant and to acquire the necessary equipment for the manufacture of *chromed* leather.[3] After the plant was equipped he engaged the services of an American student from the Instituto Politécnico of San Germán, Charles Chase, who moved to the United States for the purpose of taking a short training in the manufacture of chromed leather. Upon his return, Chase was

---

[1] Steinberg also had an interest in Atlas and was, in fact, the person who made a contract with Arroyo on behalf of Atlas.

[2] Vegetable leather is leather tanned by the action of juice of sour skins. The product is a resistant leather used mainly for the soles of shoes.

[3] Chromed leather is the tanning with chrome salts especially sulphate of chromium and potassium bicarbonate and soda. The leather thus tanned is the leather used in the upper part of shoes because it is of a finer quality.

entrusted with the management of the plant. The evidence shows that Chase, despite the fact that he had acquired certain basic knowledge, did not manufacture a satisfactory product. His lack of technical knowledge compelled him to write frequently to Soesbe asking his advice. This notwithstanding, the quality of the product was not improved. In view of this state of affairs, Arroyo took steps in an effort to find an American enterprise with vast experience in this field which could take over the operation of his tannery. He took up with Steinberg Bros., an enterprise located in the City of New York which was engaged in the manufacture of gloves, the possibility of reaching an agreement. Robert Steinberg, its principal stockholder, came to Puerto Rico, inspected the tannery, and after several meetings executed the following contract on January 21, 1949, to be effective the following March 1:

1.—Arroyo was the owner of a tannery located in Mayagüez known as Tenería Arroyo. He was the sole owner of all the buildings, equipment, and machinery, and he guaranteed that the business had net current assets at least equal to the value of those shown on the attached balance sheet dated July 31, 1948.

2.—Atlas was a corporation organized by persons with vast experience in the operation of glove and tannery businesses, and would engage in Puerto Rico in the manufacture of gloves.

3.—Arroyo bound himself to turn over to Atlas, and Atlas agreed to assume and exercise, full control and administration of said business, with power, among others, to hire, discharge, and supervise all employees, agents, etc.

4.—Arroyo bound himself to perform all acts on behalf of the management (signing of checks, contracts, etc.), and to conduct such negotiations and proceedings and to perform such other acts as may be required of him by the management and as may be appropriate and necessary.

5.—The profits and losses shall be divided equally.

6.—Atlas bound itself to purchase all the "finished grain chromed leather" [4] produced at the price of twenty-three cents per foot, provided that when the price of fourteen cents per pound of cowhide increased or decreased the selling price would be adjusted accordingly.

7.—Atlas bound itself to purchase at 10 cents per foot all the "split leather" [5] produced.

8.—If the minimum wages or the cost of the chemicals used in making chromed leather shall be increased or decreased by more than 10 per cent thereby affecting proportionately the cost of manufacture, then the price of leather would be readjusted in order to compensate for the increase or decrease.

9.—Atlas bound itself to operate, control, and manage the business in an efficient manner and to make available its experience in order to increase and maintain the level of profits, having, among others, the power to appoint a superintendent with vast experience in the management of similar businesses.

10.—The period of effectiveness of the agreement would be 12 years.

11.—The agreement would take effect on March 1, 1949, and the parties would make an inventory on that date.

12.—Within six weeks after the effective date of this agreement Arroyo will advance $50,000 to be used as working capital in the operation of the business.

13.—At any time prior to March 1, 1950, Atlas shall have an option to purchase an interest in the business up to 50 per cent.

14.—Otherwise, Atlas shall have an option to terminate the agreement at any time merely by giving 30 days' advance

---

[4] Finished chromed leather used for the manufacture of gloves.

[5] Split leather is the trimmings after cutting the leather so that its thickness may be uniform.

notice of its intention, subject in such event to the obligation to purchase all the "finished grain chromed leather" produced or in process of production.

15.—Arroyo bound himself to advance for the purchase of additional equipment certain sums not to exceed $10,000, at Atlas' request.

This was the contract which according to the plaintiffs was violated by Arroyo. The trial court concluded that the defendant had violated the contract, and in support of its conclusion it made the following findings of fact:

"(a) The contract in question went into effect on March 1, 1949. One of the obligations assumed thereunder by Arroyo was to turn over to Atlas full control, possession, and administration of the tannery and its business, including complete and exclusive authority to employ and dismiss the officers, employees, and agents. On the same day of March 1, 1949, Arroyo violated this obligation by employing a bookkeeper named Cancio and fixing him a salary of $40 weekly, without giving notice thereof to Atlas.

"(b) Early in March 1949, Arroyo, on his account and without even notifying Atlas, sold to a firm in Boston, Massachusetts, some 20,000 pounds of cowhide. Exhibit 39 of the plaintiffs. Cowhide constitutes the raw material used at Tenería Arroyo for the manufacture of leather. This action on the part of the defendant constituted a violation of the contract, since his contractual obligation was to turn over to Atlas the operation and management of all these properties and all the acts and transactions in connection therewith, Atlas having assumed the obligation to pay one half of the losses that might be sustained during its management. To dispose on behalf of a third party, in this fashion, of a great quantity of raw material without notifying or obtaining Atlas' consent, in fact prevented Atlas from operating the business efficiently.

"(c) In the contract under consideration Arroyo represents and asserts that the current net assets of Tenería Arroyo are at least equal to that revealed in the balance sheet which was enclosed with the contract, dated July 31, 1948. In order to verify this fact, as soon as the contract went into effect Atlas

asked Arroyo for a balance sheet of Tenería Arroyo (*sic*). Such balance was necessary in order to verify the financial condition of the business at the beginning of the contract and to establish the basis on which to determine thereafter the profits or losses. The defendant never sent to Atlas the balance in question, thereby violating also his obligations under the contract, inasmuch as he was bound to turn over to Atlas the complete management and operation of the properties of Tenería Arroyo. Having concluded hereinbefore that Arroyo had disposed of 20,000 pounds of leather, it is easy to conclude that the balance, which was never delivered, would have shown as of March 1, 1949, that the current net assets of Tenería were not on March 1, 1949, the same as that revealed in the balance sheet of July 31, 1948 which was attached to the contract.

"(d) On March 31, 1949, Atlas ordered Arroyo to dispense with the services of two employees, William Martínez and Cancio, and to transfer another employee, Chino, to the field of purchase of hides and sale of leather, eliminating his salary of $40 weekly and giving him a compensation of $25 weekly plus 2 per cent commission on the sales transacted by him. Under the contract, as we have seen, Atlas had exclusive authority to employ, supervise, and dismiss employees. This notwithstanding, Arroyo refused to comply with such instructions and retained Martínez and Chino in the same positions and with the same salaries as before, thereby violating once again the contract in this respect. On several subsequent occasions Arroyo interfered with the laborers of Tenería, changing their work shifts and on June 3, 1949, dismissed one of the employees, all of which he accomplished without even notifying Atlas. Lastly, on June 6, 1949, Arroyo notified Lobaugh himself that he was dismissed and that his salary would no longer be paid to him.

"(e) On May 26, 1949, without consulting or notifying Atlas, Arroyo reduced the selling price of leather in stock in Tenería from 47 cents to 42 cents per pound. Arroyo was bound by the contract to turn over the operation and management of the business to Atlas exclusively. The fixing of the price is one of the most important acts in the operation and management of a business. Such act on Arroyo's part constituted a further violation of the contract.

"(f) After the contract went into effect, Steinberg instructed Lobaugh to proceed with the tanning of one thousand pounds of chromed leather as soon as the tanning which was then in process was terminated, such tanning to be carried out in accordance with the formula used in the United States which had been tested successfully. Lobaugh attempted several times to carry out those instructions and was always prevented by Arroyo who did not permit him to do so at any time, alleging at the beginning that first he had to come to terms with Atlas with respect to investments, and further alleging that it was he (Arroyo) who would give the instructions for the operation of Tenería. These acts on the part of Arroyo also violated his contractual obligation to turn over to Atlas the full control, possession, and management of the business as well as its operation and functioning.

"(g) One of the main clauses of this contract provides that Arroyo would advance within six weeks following March 1, 1949, the sum of $50,000 to be used by Atlas as working capital in the management of the business. Notwithstanding the written demand to comply with that obligation, Arroyo never complied in any form or manner whatever. The reason adduced was that he had already advanced $40,000 in supplies and materials, which assertion was false. He further alleged, as an excuse, that Atlas had not 'organized the plant' (Exhibit 11 of the plaintiffs), such excuse being frivolous, inasmuch as it was Arroyo himself who prevented the organization of the plant by Atlas. In the negotiations which preceded the contract it was made clear that it would be Arroyo's obligation to furnish the amounts of money necessary to adequately operate the business (Exhibits B and C of the defendant), advising Arroyo that in view of the balance of Tenería Arroyo additional working capital would be needed (Exhibit D of the defendant). The breach of this clause of the contract was therefore most substantial and in fact prevented Atlas from complying with its correlative obligation to manage and operate efficiently Tenería Arroyo. (Exhibit 10 of the plaintiffs.)"

Tenería Arroyo had a competitor located in Mayagüez also, Tenería González, at a distance of less than one kilo-

meter. This tannery had contracted the services of Edwin Lobaugh,[6] and, according to Lobaugh's own admissions, his relations with the owners were not satisfactory, since lately they had refused to follow his advices and no one obeyed his instructions. Tenería González was in poor financial conditions, and by 1948 Lobaugh had approached Steinberg and proposed to him a business similar to that of Arroyo. Tenería González was engaged exclusively in the processing of vegetable leather. Although it had several pieces of machinery for the processing of chromed leather, they were not in use. Lobaugh's proposition was to use Tenería González for vegetable leather and that of Arroyo for chromed leather. At the beginning Steinberg was not interested, but later he became interested and the business reached a point where a contract similar to that of Arroyo was drafted on April 1, 1949, although it was never executed. By December

[6] Lobaugh testified that he started in the leather industry in 1907. According to his own words, his experience has been as follows:

(a) Thirteen years with a factory in Ritchway, Pennsylvania, which did not manufacture chromed leather.

(b) Nineteen years with a subsidiary factory of U.S. Leather Co. which manufactured vegetable leather and some chromed leather. He worked in the laboratory and not in production. He was engaged there in the phase of vegetable leather.

(c) Twelve years with American Oak Leather Co. which was engaged exclusively in the manufacture of vegetable leather.

(d) Five years with Himmelain & Bailey whose production was about fifty per cent of chromed leather. There he was superintendent and chemist.

(e) One year in Cuba. There he did not operate any tannery and was engaged in the chemical phase.

(f) Five years with the firm of Owensound in Canada, as superintendent. Leather for gloves was not processed there.

(g) Three years with Andrews Co. as technical supervisor. They manufactured vegetable and chromed leather. They did not manufacture leather for gloves.

(h) Three years with Tenería González in Puerto Rico which manufactured only vegetable leather.

Lobaugh himself testified that he has never been employed with a firm engaged in the manufacture of leather for gloves. On repeated occasions he testified that he is not an expert in chromed leather and that he told so to Arroyo. Soesbe corroborates this statement when he affirms that

23, 1948, according to Lobaugh, Steinberg had spoken to him about becoming superintendent of Tenería Arroyo. Arroyo was at no time notified of the plans of Atlas to execute a similar contract with Tenería González, and it was not until March 1 that Steinberg visited Tenería Arroyo, in the company of Lobaugh, to inform Arroyo on this occasion that Lobaugh was the person selected to manage his enterprise. He also informed Arroyo that, in view of the fact that Lobaugh still had a commitment with Tenería González, Lobaugh could not devote all his time to Tenería Arroyo and that he would devote only half a day until the other business was terminated. Arroyo questioned right away whether it was advisable to place at the head of his business a person who was the manager of a competitor. Arroyo testified that although he raised the point, he did not press it because Steinberg had called his attention to the fact that under the contract they were the ones authorized to appoint the manager. Arroyo then toured Lobaugh and Steinberg through the entire plant and introduced them to the employees. On this occasion they discussed the need for building a water tank

---

Lobaugh is famous among tanners as being one of the best in the processing of vegetable leather, but that nobody considered him qualified to process chromed leather. Lobaugh's inefficiency as manager arises from his own admissions that:

(1) He does not know how many tanks for tanning there were in González despite the fact that he worked there for three years.

(2) Does not know the cost of the chemical products.

(3) Does not know what part of the production cost is the cost of the chemical products.

(4) Did not calculate the percentage of profits realized on the investment.

(5) Does not know the proportion of depreciation of the machinery of a tannery.

(6) Does not know the cost of insurance.

(7) Does not know the percentage of "rejects" (useless products or products having substantial defects) in Tenería González and in Tenería Arroyo.

(8) In Tenería González he never compared the production per hour of every employee with that obtained in the United States.

(9) Does not recall if in Tenería González he calculated the average production of every employee per hour.

and it was agreed that Arroyo would be in charge of the work. Actually the construction of this tank was started immediately and terminated within a month. They discussed the need for constructing 22 additional tanks in order to increase the production. Steinberg took Levy, an engineer, to Tenería González, and explained to him how he wanted the tanks and then went to Tenería Arroyo where they discussed the place where they were to be constructed. Right there Levy gave him an approximate estimate of $9,000 to $10,000 and promised to give him the final one later. Steinberg never requested it and it was not until April 9 that Levy sent it to him at Arroyo's request.

For a better understanding of the problem presented in this case, we turn to consider the series of facts which eventually resulted in the rupture of the relations between Arroyo and Atlas. Lobaugh testifies that when he took charge of the tannery the only thing which was in process of elaboration was vegetable leather. Chromed leather was no longer tanned. As soon as Lobaugh took charge he began to make an inventory which terminated on March 29. Arroyo fully cooperated with him. On the same day the inventory is terminated Lobaugh informed Arroyo that they were not going to process any more vegetable leather until the processing under way was terminated. The idea was to clean all the tanks in order to use a new formula, but that this formula could not be prepared until chemical products arrived from the United States. Apparently these products were never received. By April 30 the plaintiff himself admits that as yet they had not been received. Arroyo, who up to that moment had cooperated in all respects despite his initial reserve upon learning that the person to be in charge of the tannery was the same person who was manager of the competitor, refuses to accept the proposition. He states that he will allow no experiment to be conducted in his factory and that he has to contact Steinberg to object.

Two days after this incident, on March 31 Arroyo received a letter from Steinberg ordering him to dismiss two employees, Cancio and Martínez, and to transfer another, Lugo Cintrón, from production to another department, reducing his salary of $40 weekly to two per cent commission on sales and authorizing him to draw on his commissions up to the sum of $25 weekly. In this letter Steinberg ratifies what Lobaugh's told him about not tanning any more vegetable leather and using a new formula.

Arroyo answered Steinberg's letter on April 4 informing him that he can not dismiss Martínez, since he has a three-year contract of which only one year has elapsed. He reminds him that Steinberg has knowledge of this fact because he had informed him at the time the negotiations for the contract were carried out. In this same letter Arroyo advised him that he is not willing to permit that anything further be done in the tannery until the final figures for some additional machinery to be acquired were sent to him. He further informed Steinberg that up to that moment nothing had been done in the tannery, that everything is very slow, and that they can not afford to lose more money as they did in the month of March.

On April 5 Steinberg wrote to Arroyo reminding him that in accordance with the contract he is bound to deposit within the first six weeks $50,000 for working capital. On April 11 Steinberg wrote to Arroyo informing him that the estimates for the purchase of additional machinery are being prepared. Regarding the employee whom Steinberg had ordered to be discharged, he reminded him that Arroyo had informed him that his services could be terminated.

On April 7 the laborers of the tannery called a strike because of shortage of work. Lobaugh wired Steinberg suggesting the advisability of increasing to three or four days a week the work of soaking the hides. Arroyo also got in touch with Steinberg urging him to come immediately

because of the state of the strike. Steinberg wired Lobaugh to inform the laborers that the stoppage in the production is temporary and that it would be resumed as soon as the chemical products for the new formula arrived. The strike continued and Steinberg came down to Puerto Rico, but did not visit the tannery. He called Lobaugh and asked him to bring to the Condado Hotel two or three of the strike leaders. At this meeting Steinberg reached an agreement whereby they would pay the workers a minimum of two days a week even though no work were performed.

On April 20 Steinberg wired Arroyo informing him of the settlement of the strike and of his inability to go to Mayagüez. Arroyo then came to San Juan where he conferred with Steinberg. Apparently he wanted to discuss the problems which had arisen in the tannery as a result of the suspension of the tanning process.

It is interesting to note that since March 1, when the contract took effect, until the following June 6, when Arroyo dismissed Lobaugh, Steinberg never visited the tannery. And we already know that Lobaugh devoted to it only several hours a day, because he had to attend to his obligations at Tenería González.

In view of what has been set forth in substance, we shall now consider each one of the violations which the trial court found had been committed by Arroyo:

(a) First, having engaged a bookkeeper with a salary of $40 a week without notifying Atlas, despite the fact that one of the obligations assumed by Arroyo was to turn over to Atlas full control, possession, and management of the tannery and of its business. But the fact remains that Steinberg himself admits that, according to the covenant, Arroyo would be in charge of the finances (Tr. Ev. 2-237), and if it was incumbent upon Arroyo to be in charge of all the finances, as well as of all the money coming in and going

out, it is reasonable that he should hire a bookkeeper trusted by him. After all, the administration and operation expenses were defrayed with the funds contributed by Arroyo.

(b) The second consisted in having sold early in March, on his own account and without notifying Atlas, 20,000 pounds of cowhides.

Regarding this alleged violation, there is nothing in the evidence to show that Arroyo made this sale after March 1, when the contract went into effect. What the evidence reveals is that the shipment of hides weighed 19,048 pounds in New York early in March, on the 8th to be exact, where it arrived via S/S Suzanne. Thus, the reality is that the evidence does not show conclusively and clearly that the sale of the hides took place in March, but, on the contrary, it tends to show that it possibly took place in February.

(c) Another violation allegedly committed by Arroyo is that in the contract he asserted that the current net assets of the tannery were at least equal to that shown on the balance sheet which was attached to the contract and which is dated July 31, 1948, and the defendant never turned it in.

We believe that the failure to deliver this balance sheet was not sufficient basis for considering a violation of the contract to such an extent as to give rise to the filing of an action for damages.

But, furthermore, at pp. 157–58 of the Tr. of Ev. (piece 2), Lobaugh, witness for the plaintiffs, testifies that he does not recall whether Arroyo showed him the balance as of March 1, 1949, adding that he could not assert that he did not.

The finding made by the trial court to the effect that since it found that Arroyo sold 20,000 pounds of hides in March 1949, it was clear that the balance as of March 1 of that year had to be less than that of July 31, 1948, which was enclosed with the contract, is not supported at all by the evidence. In the first place, we have shown that there is nothing

to support the finding that the sale of the hides was carried out in the month of March, and, in the second place, the conclusion is merely a speculation, since conceivably, even after the sale of the hides, the balance as of March 1, 1949 could have been equal to that of July 31, 1948. It all depended on the amount of hides in stock.

(d) The next violation consisted in that Atlas asked Arroyo to dispense with the services of two employees, Martínez and Cancio, and to transfer Lugo Cintrón (Chino) in charge of the purchase and sale of hides on a commission basis.

Regarding this violation, it would suffice to say that, as respect Martínez, Arroyo notified Steinberg that he had a three-year contract, that perhaps he could make arrangements to terminate it, but evidently the employee did not agree and Arroyo was therefore prevented from dismissing him. Regarding Lugo Cintrón (Chino), Lobaugh himself, as witness for the plaintiff, testified that Steinberg's order was carried out and that Lugo Cintrón was transferred from employment. When Lugo refused to accept the transfer, Lobaugh himself went after him in order that he should resume his job. As respects Cancio, we repeat here what we said before, that Cancio was a bookkeeper who had been chosen by Arroyo to help him in his commitment of being in charge of the finances of the business.

Regarding the other findings of fact in connection with the dismissal of an employee and the change of shifts, we have not found anything in the evidence to warrant that conclusion. On the contrary, the evidence discloses that the operations of the plant were suspended while the chemical products arrived. Furthermore, from the evidence it appears (Exhibit 5 of plaintiff) that Steinberg requested Arroyo and not Lobaugh to dismiss Martínez and Cancio and to

transfer Lugo Cintrón, admitting that Arroyo was the person in charge of the management. We will take up later Lobaugh's dismissal.

We turn to consider the remaining violations which in the opinion of the trial court constituted basis for the action brought: the fact that Arroyo sold vegetable leather at 42 cents a pound when the price was 47 cents; not having permitted Lobaugh to process 1,000 pounds of chromed leather; and the failure to contribute $50,000 toward working capital. We will discuss these three jointly with Lobaugh's dismissal as superintendent of Tenería Arroyo.

In order to consider them, it is necessary to review the situation prevailing in the tannery as of March 1. The process of tanning vegetable leather is altogether suspended pending the arrival of certain chemical products. They did not proceed with the tanning of chromed leather despite the fact that there were facilities for both processes. As a result of the suspension of activities the workers called a strike. And the person selected by Steinberg to manage the tannery is the same person in charge of a competitor plant. Moreover, he does not have experience in the tanning of chromed leather as shown by his own admissions. See footnote 6. Arroyo, who has been furnishing all the money necessary to pay the employees and also Lobaugh, must be concerned with the situation as it develops. The tanning process is suspended and the overhead expenses remain the same. Lobaugh then attempts to conduct some experiments with a new formula. Arroyo is risking everything, since the money being expended is his own. Although the contract provides that the losses will be sustained equally by Atlas and Arroyo, the fact is that possibly the only thing Arroyo could do would be to bring a judicial action against Atlas Corporation which was recently organized.

It seems to us that Arroyo's action was reasonable in view of the prevailing circumstances. The tannery was

practically at a standstill and it is sought to conduct certain experiments. It was then that Arroyo proposed that nothing new be done until he speaks with Steinberg for the purpose of clarifying the situation.

In view of this situation, Arroyo decided to sell certain leather at 42 cents at a time when it is alleged the market price was 47 cents. Regarding the allegation that the sale was made by Arroyo, the evidence tends to show, as stated hereinbefore, that Arroyo's intervention in the administration had Steinberg's consent. It was Arroyo whom Steinberg asked to dismiss certain employees. Regarding the price of 42 cents, apparently Tenería González, the competitor, which was administered by Lobaugh himself, was under liquidation and sold leather at 42 cents. Arroyo, who evidently was pressed for money to pay the fixed expenses of the tannery, elected to sell at the price prevailing at that time.

Referring to the violation charged to Arroyo that he did not contribute the sum of $50,000 allegedly agreed upon for working capital, Arroyo wrote to Steinberg, as set forth in the finding of fact hereinbefore transcribed, explaining his interpretation of the contractual clause. Steinberg did not answer that letter. It should be recalled that it is Arroyo who has been paying all the operating expenses of the tannery during three months. He was therefore complying with the contract. In view of Steinberg's failure to answer his letter, it could be argued that he accepted Arroyo's interpretation of the contract. But if this were not so, it is clear that Steinberg was not justified in remaining idle and subsequently some time after bring a suit to recover damages, since Atlas had not invested nor risked anything and it was Arroyo who had invested and risked everything.

Arroyo, it seems to us, was justified in dismissing Lobaugh. The foregoing recital justifies his action. He is not, as he himself admits, the expert agreed upon in the contract to take charge of the business. However, the fact that

Arroyo acted in that fashion not only in his dealings with Lobaugh but also in all his other dealings, does not warrant the filing of an action such as the present one. Steinberg should have sought to settle his differences with Arroyo. The evidence shows that at the beginning the latter was willing to cooperate and did in fact cooperate with Lobaugh. It is after a reasonable period elapses that Arroyo begins to worry. The business is at a standstill and he is the one who is defraying all the expenses. Steinberg does not visit the tannery, and on one occasion when Arroyo is able to speak with him Arroyo must come to San Juan. Apparently, Steinberg assumed an Olympic attitude. He was no longer on good terms with Arroyo; he did not meet him in an effort to settle the existing differences. He chose to sue for damages for the profits which he failed to receive.

In view of his initial cooperation and his attitude in defraying all the expenses for three months, we do not believe that Arroyo's actions justified Atlas in not attempting to settle the existing differences and in filing instead an action for damages.

We do not believe, as does the plaintiff, that it may be asserted that Arroyo's conduct was "decidedly adverse to the bona fide performance of the contract." As has already been stated, his action is one of cooperation. He accepts Lobaugh despite the fact he was working for a competitor and devoted only a few hours a day to Tenería Arroyo, paid the employees despite the fact that the production was nil, and shows his interest in constructing a water tank and in requesting the blueprints for the additional tanks. He gets in touch with Steinberg at the time of the strike and asks him to come to Puerto Rico to settle the labor situation. It is only when attempts are made to conduct certain experiments, the production being at a standstill, that Arroyo told Lobaugh not to proceed until he spoke to Steinberg. Steinberg, on the contrary, does not visit the plant after March 1 when the

contract went into effect, and apparently after June 6, when Arroyo dismisses Lobaugh, there is no more communication between Arroyo and Atlas. It cannot be properly maintained that these acts show that Arroyo did not fulfill his obligations.

From all the foregoing we conclude that defendant Arroyo did not commit a breach of contract that might give rise to a cause of action in favor of the plaintiff for nonperformance. Considering all the attendant circumstances, we can not make him bear—in addition to the heavy burden which he carried during several months—the consequences found by the trial court on the basis of mere trifles, and, moreover, when it appears that the very entity which assigned its cause of action to the plaintiff was not free from all taint or sin.

The judgment entered by the Superior Court, San Juan Part, on November 25, 1957, is reversed and the complaint is dismissed. The plaintiffs are ordered to pay $5,000 for attorney's fees.